

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed September 11, 2007            **United States Bankruptcy Judge**

---

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: § | | |
| § | | |
| TRINITY MEADOWS RACEWAY, INC. § | Case No. 97-41302-DML-7 | |
| § | | |
| Debtor. § | | |
| § | | |
| TRINITY MEADOWS RACEWAY, INC., § | | |
| § | | |
| Plaintiff, § | | |
| § | | |
| v. § | Adversary No. 06-04165 | |
| § | | |
| TEXAS RACING COMMISSION OF § | | |
| THE STATE OF TEXAS, and § | | |
| R. DYKE ROGERS, IN HIS CAPACITY § | | |
| AS FORMER AND ACTING CHAIR OF § | | |
| THE TEXAS RACING COMMISSION OF § | | |
| THE STATE OF TEXAS, § | | |
| § | | |
| Defendants. § | | |

## MEMORANDUM OPINION

On April 9, 2007, this court conducted a hearing (the "Hearing") on "*Plaintiff's Motion for Partial Summary Judgment*" (the "Plaintiff's MSJ") filed by Trinity Meadows Raceway, Inc. ("Trinity Meadows" or "Debtor") and "*Defendants' Motion for Summary Judgment*" (the

"Defendants' MSJ" and, together with Plaintiff's MSJ, the "Motions") filed by the Texas Racing Commission (the "TRC") and R. Dyke Rogers, Chair of the TRC (together with the TRC, "Defendants").[1] The court heard oral arguments from counsel for the Parties and considers various exhibits and affidavits submitted by the Parties in support of the Motions, which are identified as necessary below. The court exercises its core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(G). This memorandum opinion embodies the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052.

## I. Background

The TRC is the Texas agency solely responsible for adopting and enforcing rules pursuant to the Texas Racing Act, Tex. Civ. Stat. Art. 179e (the "Act"). These rules have been adopted by the TRC pursuant to the Administrative Procedure Act, Texas Govt. Code Chapter 2001.

In 1989, Trinity Meadows was issued a Class 2 pari-mutuel horse racetrack license (the "License") by the TRC. Under section 6.18(a) of the Act, a racetrack license is perpetual unless and until it is revoked. Trinity Meadows conducted pari-mutuel horse races and wagering on simulcast races at its facility in Willow Park, Texas, each year from 1990 until 1996.

Pursuant to various provisions of the Act and rules promulgated by the TRC, Trinity Meadows was liable to the TRC for (i) an officials' fee, (ii) a license fee, (iii) costs relating to a private telephone line, (iv) payments to the Texas Commission on Alcohol and Drug Abuse, (v) payments to the Texas Bred Incentive Programs, and (vi) monies owed from a twin trifecta pool.[2] Additionally, pursuant to section 3.07 of the Act, Trinity Meadows was required to pay

---

[1] The Plaintiff and Defendants will be collectively referred to as the "Parties."

[2] Trinity Meadows offered a twin trifecta pool, which consisted of a pool that was carried over from one wagering day to the next wagering day.

the Texas A&M Veterinary Medical Diagnostic Drug Test Laboratory ("<u>TVMDL</u>")³ for analyzing urine and blood specimens collected from some of the horses that raced at the Willow Park facility.

Trinity Meadows ceased all live racing and all pari-mutuel wagering activities on August 6, 1996. As of August 14, 1996, Trinity Meadows owed $64,510.04 to the TRC and $57,723.92 to the TVMDL.

The TRC commenced a disciplinary action against Trinity Meadows styled No. 96-R4-02, *In the Matter of Trinity Meadows Raceway, Inc.*⁴ In an attempt to resolve matters addressed by the disciplinary action, the TRC and Trinity Meadows waived their right to a contested case, electing instead to enter into an agreed order dated November 1, 1996 (the "<u>Agreed Order</u>"). The Agreed Order provided, *inter alia*, that the License would be suspended until Trinity Meadows addressed five matters. The five requirements imposed on Trinity Meadows were set out as Findings of Fact § 17(a)-(e), by which Trinity Meadows agreed to (a) pay cash vouchers presented to it, (b) pay amounts owed to the TRC and the TVMDL, (c) assign an account receivable to the Texas Horseman's Partnership, LLP, in payment of purses, (d) submit a management and capitalization plan to the TRC for the track's 1997 live race meeting, and (e) provide evidence that it had received an infusion of $300,000 in new working capital.⁵

By its consent to the Agreed Order, Trinity Meadows agreed that it would surrender the License without the need for further proceedings if it failed to perform all five requirements. Specifically, paragraph 19 of the Agreed Order provided that if Trinity Meadows failed to

---

³ The TVMDL is an agency of the State of Texas.

⁴ The action was an administrative proceeding pending before the TRC pursuant to section 3.15 of the Act.

⁵ The Agreed Order also provided that the License would be revoked if the TRC determined that "Trinity Meadows is unqualified to perform the duties of a racetrack licensee by virtue of its failure to operate the racetrack in a manner that would ensure continued operation and fiscal solvency."

<u>Memorandum Opinion</u>

perform the acts described in Findings of Fact § 17(d) and (e) before April 1, 1997, Trinity Meadows would voluntarily surrender the License for automatic revocation without the necessity of further proceedings by the TRC.

Prior to the passage of the April 1 deadline however, Trinity Meadows was placed into an involuntary bankruptcy styled, *In re Trinity Meadows Raceway, Inc.*, Case No. 97-41302, filed pursuant to 11 U.S.C. § 303 in the Northern District of Texas on March 4, 1997 (the "Petition Date"). On March 27, 1997, the court entered an order for relief on the involuntary petition. A chapter 7 trustee (the "Trustee") was appointed shortly after the order for relief was entered.

According to the Parties' briefs and representations made at the Hearing, there is no dispute that Trinity Meadows complied with Findings of Fact § 17(a)-(c). The Parties also agree that Trinity Meadows did not comply with Finding of Fact § 17(d) or (e) of the Agreed Order[6] prior to the April 1, 1997 deadline.[7]

On August 6, 1997, the court entered its "*Order Authorizing the Trustee to Sell the Real and Personal Property (Exclusive of Accounts Receivable) to the Highest Bidder Free and Clear of Liens, Claims, Encumbrances and Taxes*" which effectuated a sale from the Trustee to Curtis and Larry Lawley (the "Lawleys")[8] of the real property where the racetrack was located and most of Debtor's personal property. On January 29, 2002, the court entered an order permitting the Trustee to sell the Trinity Meadows corporate shell to the Lawleys (and their assigns).

---

[6] On April 9, 1997, the TRC sent a letter addressed to the Trustee stating that the License had been revoked on April 1, 1997.

[7] The court notes that the Trustee did not seek to avail himself of the rights provided to him under 11 U.S.C. § 108(b). Section 108(b) provides, in relevant part, that if an order entered in a nonbankruptcy proceeding fixes a period within which the debtor may cure a default or perform a similar act and that time period has not expired before the date of the filing of the petition, the trustee may perform such act before the later of (i) the end of such period or (ii) 60 days after the order for relief is entered. Based on this formula, the Trustee had until May 26, 1997 (as opposed to the April 1 deadline) to perform under Findings of Fact § 17(d) and (e) of the Agreed Order. Neither party raised this issue prior to the Hearing and only addressed it during the court's questioning of counsel.

[8] The Lawleys also had furnished funds to pay the TRC and the TVMDL as required by Findings of Fact § 17(a)-(c).

On June 30, 2006, Debtor commenced this adversary proceeding (the "<u>Adversary Proceeding</u>")[9] asking that the court (i) enjoin Defendants from revoking, denying, or otherwise interfering with the License,[10] (ii) enjoin Defendants from continuing to refuse to reinstate the License, and/or (iii) hold that Defendants are estopped to deny the effects of Debtor's bankruptcy proceeding and Debtor's automatic stay.[11]

## II. <u>Standard for Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *In re Ramba, Inc.*, 416 F.3d 394, 402-03 (5th Cir. 2005). In instances where, as here, both parties have moved for summary judgment, the court should weigh each party's claim against this standard. *In re Wild*, 50 B.R. 410, 411-12 (Bankr. D.N.D. 1985). If no material facts which are necessary to a decision are subject to dispute, the case may be resolved in favor of the movant who prevails on the facts and law. *Id*. In the case at bar, there is no dispute concerning any material fact, and summary judgment is therefore appropriate.

---

[9] Prior to commencing this adversary, the underlying bankruptcy case was reopened pursuant to an order dated October 4, 2006.

[10] According to counsel for Trinity Meadows, the Lawleys applied for a new racetrack license and the TRC denied the application because an additional racetrack known as Lone Star Park began to operate in close proximity. Accordingly, in order for the new owners of Trinity Meadows (the Lawleys) to resume operation of the Willow Park facility, the old license, i.e., the License, which arguably was revoked on (or after) April 1, 1997, must be resurrected.

[11] The court assumes that Debtor requests that the court thus find that Defendants are estopped from arguing that the revocation of the License was not a violation of the automatic stay.

### III. Discussion

**A.** *Defining the Dispute*

11 U.S.C. § 362(a)[12] provides, in relevant part, that a petition filed under section 303 operates as a stay applicable to all entities of "the commencement or continuation…of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the [petition date], or to recover a claim against the debtor that arose before the commencement of the case…" and "any act to …exercise control over property of the estate." 11 U.S.C. § 362(a)(1) and (3). At the Hearing, counsel for Defendants conceded that the general provisions of section 362(a) applied to Defendants (subject to section 362(b)(4)).[13] There is no question that Defendants' revocation of the License, disregarding exceptions defined in section 362(b), violated the automatic stay. *See In re Nat'l Cattle Congress, Inc.*, 179 B.R. 588, 597-98 (Bankr. N.D. Iowa 1995) (holding that revocation of a pari-mutuel dog racing license constituted an exercise of control over property of the estate).

Defendants argue, however, that section 362(b)(4) provides a safe haven for them because it exempts from application of the stay those actions which are undertaken pursuant to an entity's police and regulatory power. *See* 11 U.S.C. § 362(b)(4). Debtor essentially advances two arguments against Defendants' defense: (i) in 1997, the regulatory and police power exception found in section 362(b)(4) was not a defense to a stay violation under section 362(a)(3), and (ii) although there is no question that the police and regulatory power applies to stay violations under section 362(a)(1), Defendants' revocation of the License was not done

---

[12] In 1998, Pub.L. 105-277 § 603 (the "1998 Act") made changes to Title 11 of the United States Code (the "Bankruptcy Code") as it existed in 1997. Unless otherwise stated, citations to sections of the Bankruptcy Code relate to those sections as they existed prior to the amendments effected by the 1998 Act. The significance of the changes made by the 1998 Act will be discussed *infra*.

[13] Defendants also conceded that the License constituted "property of the estate" under 11 U.S.C. § 541 (*see also Hudson v. Tex. Racing Comm'n*, 455 F.3d 597 (5th Cir. 2006)), and therefore this memorandum opinion does not address that issue.

pursuant to Defendants' police or regulatory power but rather was an action to enforce a monetary obligation. For the reasons stated herein, both of Debtor's arguments fail.[14]

**B.** *Did § 362(b)(4) apply as to § 362(a)(3)?*

Today, section 362(b)(4) makes clear that the filing of a bankruptcy petition does not operate as a stay of regulatory proceedings under, *inter alia*, section 362(a)(3). However, prior to 1998,[15] the words[16] of section 362(b)(4)[17] only specifically excepted from the stay actions described in section 362(a)(1) (the commencement or continuation of a proceeding that could have been commenced prepetition and actions to recover a claim), and did not, therefore, facially exempt from the stay actions described in section 362(a)(3) (acts to obtain possession of or exercise control over estate property).[18] *See Chao v. Hospital Staffing Services, Inc. (In re Hospital Staffing Services, Inc.)*, 270 F.3d 374, 385 n.6 (6th Cir. 2001). Thus, a literal reading of

---

[14] Because the court finds that Defendants have a defense to Plaintiff's complaint under either scenario, it is unnecessary for the court to determine whether Defendants' actions in fact constituted violations of the automatic stay under 362(a)(1) or (a)(3) or both.

[15] As a general rule the court must apply the provisions of the Bankruptcy Code as they existed at the time a case was filed. *See In re Northwest Timberline Enter., Inc.*, 348 B.R. 412, 416 n.1 (Bankr. N.D. Tex. 2006) (stating that joint bankruptcy cases were governed by the Bankruptcy Code as it existed before the effective date of subsequent amendments, since the cases were filed before the amendments became effective). This rule is, at least arguably, not strictly applicable in the case at bar, as discussed *infra*.

[16] Section 362(b)(4) in 1997 provided that the automatic stay did not operate as a stay "under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power."

[17] The exception relating to the police and regulatory power was actually found in section 362(b)(4) and (5) prior to the amendments made by the 1998 Act. Section 362(b)(5) carved out from the police and regulatory power exception the enforcement of a money judgment (thus an exception to the exception), which will be the subject of further discussion *infra*. The changes made by the 1998 Act combined the two sections into what is now section 362(b)(4) and added language to section 362(b)(4) to clearly cover section 362(a)(3).

[18] Section 362(a)(3), as it existed in 1997, provided specifically that a petition filed under section 303 operated as a stay, applicable to all entities, of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." The last clause, respecting exercise of control, was added in 1984.

the statute suggests that at the Petition Date,[19] the police and regulatory exception to the automatic stay of section 362(a) was a very narrow one.

The court, however, concludes that the exception provided in section 362(b)(4) as of the Petition Date was broad enough to permit the TRC to acknowledge revocation of the License as provided by the Agreed Order. First, assuming, arguendo, that the TRC's conduct indeed amounted to an exercise of control over property of the estate[20], that conduct in fact was no more than a "continuation . . . of a . . . proceeding . . . that was commenced before the commencement of the case . . . ." To read section 362(b)(4) as limited to permitting continuation only of those proceedings which would not limit use of property of the estate would emasculate a regulatory exception that was enacted in response to cases which, under prior law, held the stay prevented enforcement against bankrupts of, *inter alia*, environmental laws and regulations.

Notwithstanding the apparent violation of the automatic stay when regulatory proceedings affect property of the estate, section 362(a)(1) and (a)(3), to be read together with section 362(b)(4) as it existed in 1997, must be read to have permitted regulatory action against a debtor that affects that debtor's ability to use its property. Indeed, section 362(a)(3) was intended to prevent, obtaining possession of property of the estate – and, through exercise of control, usurpation of value of estate property.[21] Moreover, section 362(a)(1) is not limited to

---

[19] Debtor argues in the alternative that the date of revocation of the License is the date the court should look to in applying section 362. As there was no change to the law between the Petition Date and April 1, 1997 (or May 26, 1997, taking account of section 108), this distinction is not significant.

[20] It is at least arguable that the TRC only continued a pending proceeding and did not in fact exercise control over estate property. Rather it was the continuation of the proceeding itself, rather than any "exercise [of] control" that affected the License.

[21] Although there is no explanation in the legislative history to the 1984 amendments for the addition of the control language, various courts have advanced theories about why Congress amended section 362(a)(3). *See, e.g., Patterson v. B.F. Goodrich Employees Fed. Credit Union (In re Patterson)*, 125 B.R. 40, 44-45 (Bankr. N.D. Ala. 1990) and *In re Wildcat Constr. Co.*, 57 B.R. 981, 985 (Bankr. D. Vt. 1986) (opining that the intended purpose was to overrule cases that permitted financial institutions to "freeze" debtor's bank account; *In re Knaus*, 889 F.2d 773 (8th Cir. 1989) (stating that the expanded scope of the automatic bankruptcy stay was intended to affect pre-petition

actions that do not limit a debtor's use of property. Therefore, subsections (a)(1) and (b)(4) should be read to permit commencement or continuation of proceedings that would limit a debtor's use of property in violation of regulatory law. *Cf.* 28 U.S.C. § 959.

In the case at bar, Debtor would have this court conclude that between 1984 and 1998 governmental units could only commence or continue proceedings against debtors if those proceedings would not have the effect of controlling property of the estate in any way. But the court is hard pressed to accept that argument considering that such a limitation on proceedings would essentially gut a governmental unit's police power so that, for example, the Environmental Protection Agency could not force a debtor to cease polluting. In fact, it is hard to imagine any regulatory proceeding that does not in some way effect some degree of "control" over property of the estate.

It would be virtually impossible to cause a debtor or trustee to comply with environmental laws without affecting the use of estate property; thus, if section 362(b)(4) were interpreted *not* to permit regulatory bodies to exert some means of control over estate property,[22]

---

creditor repossession activities); *Javens*, 107 F.3d at 368 (opining that the amendment was meant merely to broaden the concept of possession and should, therefore, be read to be similar in meaning to situations such as those of controlling a corporation or its assets through voting trusts or shareholder agreements, rather than by possessing it outright). This court considers persuasive the reasoning of the *Javens* court. Because the term "possession" pre-dated the 1984 amendments, Congress, by adding the phrase "exercise control," intended to broaden the concept of possession and thus section 362(a)(3) should not affect a governmental unit's police and regulatory power to the extent that the governmental unit is not taking physical possession of property of the estate or seeking to usurp its economic benefit. This view is consistent with a leading commentator's view, circa 1997, that section 362(b)(4) at that time was intended "to permit regulatory . . . actions to proceed in spite of section 362(a)(1) but not to permit a seizure of property." 2 Collier on Bankruptcy ¶ 362.05[4](15th Ed. 1995).

[22] Many actions against a debtor taken under a governmental unit's police and regulatory power have the effect of "controlling" property of the estate. *Javens*, 107 F.3d at 367. If exercise of police and regulatory power could not effect "control" over property of a debtor's estate, the limitation would too often void an exception Congress intended in the Bankruptcy Code. *Id.*; *see also In re Beker Indus. Corp.*, 57 B.R. 611 (Bankr. S.D.N.Y. 1986) (holding that a contrary reading would overrule the numerous cases excepting governmental regulation from the automatic stay, which Congress would not likely have done without some strong expression of intent, especially in view of its clear intent to create such exception); *see,* to similar effect, *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) (Congress did not intend Code's fraudulent transfer provisions to reach regularly conducted foreclosure where that would amount to a change in the law); *but cf. Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n*, 997 F.2d 581 (9th Cir. 1993) (holding that a governmental agency's dissolution of a corporation resulted in "control" of property of the estate and thus violated the automatic stay of section 362(a)(3) for which there was no

the effect would be to vitiate a principal purpose that section was intended to serve. As discussed below, it is a better reading of section 362(b)(4) as it existed prior to 1998 to hold that it allowed pursuit of regulatory proceedings of the sort described in section 362(a)(1) even if those proceedings would impair a trustee's ability to use estate property. Such a reading conforms the scope of section 362(a)(3) to actions taken directly by a party that affect estate property but not necessarily to cover limits of the use of estate property that come about as a consequence of a proceeding falling within the ambit of section 362(a)(1).

Even if such a reading of the statute is too restrictive as to section 362(a)(3),[23] the court concurs with those courts that have held section 362(b)(4), even in its pre-1998 form, to permit pursuit by a governmental unit of regulatory proceedings which would otherwise violate the stay as an exercise of control over property of the estate.[24] Besides being consistent with Congress's intent in originally crafting the regulatory exception, Congress confirmed in its clarification in 1998 that the regulatory exception was not intended to be trumped by the addition of the control clause to section 362(a)(3).[25] The conclusion that Congress never intended the change to section

---

exception). This court agrees with the courts holding that the exception of police and regulatory power of section 362(b)(4) applies to commencement or continuation of proceedings that arguably result even n an exercise of control within the meaning of section 362(a)(3).

[23] As initially enacted, section 362(a)(3) made no reference to exercising control over estate property. It was not until 1984 that Congress amended section 362(a)(3) to include the words "exercise control." The expansion of section 362(a)(3) without a corresponding expansion of section 362(b)(4) created the tension that is the source of controversy in the case at bar. Although Congress rectified the inconsistency in 1998, several courts struggled with the gap occurring between 1984 and 1998. *See, e.g., Javens v. City of Hazel Park*, 107 F.3d 259 (6th Cir. 1997); *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n*, 997 F.2d 581 (9th Cir. 1993); *Cournoyer v. Town of Lincoln*, 790 F.2d 971 (1st Cir. 1986); and *In re Beker Indus. Corp.*, 57 B.R. 611 (Bankr. S.D.N.Y. 1986).

[24] *See In re Beker Indus. Corp.,* 57 B.R. 611, 625 (Bankr. S.D.N.Y. 1986); *In re National Cattle Congress, Inc.*, 179 B.R. 588, 595 (Bankr. N.D. Iowa 1995); *cf. Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581 (9th Cir. 1993).

[25] *Cf. Lamie v. United States Trustee*, 540 U.S. 526 (2004), in which the Court noted Congress's failure to cure an alleged inadvertent drafting omission in 11 U.S.C. § 330 as a reason not to conclude the omission was, in fact, inadvertent and so should be rectified by the Court.

362(a)(3) to limit the regulatory exception is supported by the effectiveness of the 1998 amendment to section 362(b)(4) in pending cases.[26]

Indeed, in the case at bar the amendment to section 362(b)(4) might be deemed a retroactive validation of the TRC's acknowledgement of revocation of the License, similar to retroactive nullification of the automatic stay to validate a post-petition foreclosure. *See, e.g., In re Aheong*, 276 B.R. 233, 252 (B.A.P. 9th Cir. 2002). Especially given the TRC's repeated references to revocation of the License after the amendment of section 362(b)(4), it is reasonable for the court to conclude that, even if ineffective initially, the TRC succeeded in revoking the License later in the case. In fact, with the case now reopened, even were the court to rule in Plaintiff's favor, the TRC could act to revoke the License.

The court's conclusion that the TRC's acknowledgement of revocation of the License was permissible is consistent not only with the weight of precedent but also with the history of section 362(b)(4). The tug-of-war between the state's regulatory and police power and the automatic stay predates the passage of the Bankruptcy Code in 1978.[27] The Supreme Court has opined that the police and regulatory exception to the automatic stay arose in the context of environmental concerns. *See Midatlantic Nat'l Bank v. New Jersey Dept. of Env't. Prot.*, 474 U.S. 494 (1986). Between 1973 and 1978, some courts had interpreted the automatic stay to preclude states' efforts to enforce their antipollution laws, and Congress wanted to overrule these

---

[26] The 1998 Act is silent as to whether the amendments to section 362(b)(4) applied to cases pending at the time of the effective date. *See* Pub.L. 105-277 § 603. In the absence of such language, the general rule is that the court should apply the statute in pending cases. *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711 (1974).

[27] The automatic stay first came into existence through promulgation of the rules of bankruptcy procedure adopted pursuant to 28 U.S.C. 2075 between 1973 and 1978. *See* former Bankruptcy Rules 401, 601, 10-601, 11-44, 12-43, and 13-401. Prior to 1973, stays of acts against property had to be obtained through injunctive relief proceedings initiated by an estate representative. *See, e.g.*, former Bankruptcy Act §§ 2(15), 113, 116(4), and 314; 1 COLLIER ON BANKRUPTCY ¶ 2.61[2] (14th ed rev. 1974); 3 COLLIER ON BANKRUPTCY ¶ 362.LH[2] (15th ed rev. 2002). *Cf. Chesnut v. Brown (In re Chesnut)*, 422 F.3d 298 (5th Cir. 2005).

decisions in the 1978 law. *See id.* at 504 (citing H.R.Rep. No. 95-595, *supra,* at 174-175, U.S.Code Cong. & Admin.News 1978, pp. 6134-6136). The Supreme Court noted that the House Report also referred to an unreported case from Texas where a stay prevented the State of Maine from closing down a debtor's plant that was polluting a river in violation of the state's environmental protection laws. *See id.* (citing H.R.Rep. No. 95-595, pp. 174-175 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6134-6136). Thus, it is clear that when Congress codified the police and regulatory power exception in 1978, it did so anticipating that governmental units would exercise some control over property of the debtor's estate and did not intend to limit the exception to initiation or continuation of a legal or administrative proceeding that would not affect estate property.

In sum, precedent, policy and the conduct of Congress favor concluding that section 362(b)(4) permitted the TRC to exercise its regulatory powers, even if the effect was an exercise of control over estate property. It is possible to square such a holding even with the plain meaning of sections 362(a)(1) and (3) and 362(b)(4). Subject, then, to the question of whether the TRC was, in fact, exercising its regulatory powers in enforcing the Agreed Order, the court holds it was not barred from doing so by section 362(a)(3).

C.  *Were Defendants Exercising Their Police and Regulatory Powers When They Revoked the License?*

Section 362(b)(4) was enacted to permit regulatory, police and criminal actions to proceed in spite of, *inter alia*, section 362(a)(1), and to permit enforcement of resulting judgments or orders, other than money judgments, in spite of section 362(a)(2). 3 Collier's on Bankruptcy 362.05[a] (15th ed rev. 2006).[28] Debtor argues that Defendants' revocation of the License does not pertain to Defendants' power to protect the public's health, welfare or safety

---

[28] See, similarly, 2 Collier on Bankruptcy ¶ 362.05[5] (15th ed. 1995).

**Memorandum Opinion**

pursuant to section 362(b)(4) and that the Agreed Order makes clear that the terms of the order were intended to effect recovery of the debts owed to Defendants (and the TVMDL) by Trinity Meadows.

To determine whether an action is excepted from the automatic stay as a police or regulatory action or is simply a collection action, courts have developed two tests of the government's action:[29] (i) the pecuniary purpose test, and (ii) the public policy test. *Berg v. Good Samaritan Hosp., Inc. (In re Berg)*, 230 F.3d 1165 (9th Cir. 2000).

Under the pecuniary interest test, courts focus on whether the governmental proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety or public policy. *Chao*, 270 F.3d at 385; *see also NLRB v. Continental Hagen Corp.*, 932 F.2d 828, 833 (9th Cir. 2001) (quoting *NLRB v. Edward Cooper Painting,* 804 F.2d 934 (6th Cir. 1986)); *In re Spookyworld, Inc.*, 346 F.3d 1, 9 (1st Cir. 2003). It is well settled that the police or regulatory power exception cannot be used simply to enforce a governmental unit's pecuniary interests. *Continental Hagen Corp.*, at 833; *In re NextWave Personal Communications*, 244 B.R. 253, 274 (Bankr. S.D.N.Y. 2000).

Under the public policy test, reviewing courts must distinguish between proceedings that adjudicate and advance private rights and those that effectuate public policy. Only proceedings

---

[29] As one district court noted, "Although the Fifth Circuit has not written in this area, other circuits interpreting the regulatory and police power exception generally use two tests to determine whether a governmental action falls within the exception to the automatic stay: the 'pecuniary purpose' test and the 'public policy' test." *Chao v. Mike & Charlie's Inc.*, No. Civ.A. H-05-1780, 2006 WL 18467, *1 (S.D. Tex. Jan. 6, 2006). Like the court in *Mike & Charlie's Inc.*, this court accepts that the two tests are an adequate measure for determining whether the regulatory and police power exception applies to the case at bar. Although it is not clear whether a governmental unit must pass either or both tests, the inquiry is inconsequential because, as the court addresses below, Defendants' actions pass both the pecuniary interest and public policy tests. *See City & County of San Francisco v. PG & E Corp.*, 433 F.3d 1115, 1124 n. 11 (9th Cir. 2006) (noting that although a governmental unit need only pass one of the tests in the Ninth Circuit, a conjunctive rather than disjunctive analysis is consistent with legislative history discussing the public policy exception to the automatic stay).

that effectuate public policy are accepted from the stay. *Chao*, 270 F.3d at 385-86 (quoting *Word v. Commerce Oil Co.* (*In re Commerce Oil Co.*), 847 F.2d 291, 295 (6th Cir.1988)).

The court is confident that, under both the pecuniary interest and the public policy test, Defendants were exercising their police and regulatory power when they revoked the License. In applying these tests to Defendants' actions, the court observes that Defendants are charged with the regulation of wagering in the racing industry in Texas. *See* Act § 1.02. The racing market involves the daily inflow and outflow of cash belonging to Texas citizens. A cursory review of the Act reveals that the Texas legislature has determined that this wagering activity—including the payment of wagers and purses—must be subject to strict regulation.[30] Defendants argued that the TRC required proof of new capital infusion and payment of past debts to insure that Trinity Meadows would not stop races in the middle of the racing year and that there would not be fertile ground for fraud or mismanagement.

The Agreed Order supports Defendants' position. Although Findings of Facts § 17(a)-(c) arguably enforce monetary obligations, the court cannot read these provisions in isolation. Findings of Fact § 17(d) and (e) appear to address non-monetary concerns that the TRC had with the operation of Debtor's racetrack. These concerns go to the heart of the TRC's duty to regulate this type of industry.[31] *See* Act § 1.02. Though the Agreed Order required payment of debts to the TRC and TVMDL, both agencies of the state, it also addressed payment of purses and wagers, and future economic stability, as affected by § 17(d) and (e), is of as great consequence to satisfaction of those sorts of obligations as of amounts due to the state. Thus the Agreed

---

[30] The Act provides that its purpose is to "provide for *strict* regulation of horse racing and greyhound racing and the control of pari-mutuel wagering in connection with that racing." Act § 1.02 (emphasis added).

[31] The provision of the Agreed Order providing that Defendants may revoke the License if "Trinity Meadows is unqualified to perform the duties of a racetrack licensee by virtue of its failure to operate the racetrack in a manner that would ensure continued operation and fiscal solvency" is further illustrative that Defendants' interest in Trinity Meadows's finances goes to the heart of the agency's regulatory goals.

Order serves to carry out important regulatory duties of the TRC. Moreover, a bankruptcy court in determining whether a governmental unit is acting within its police and regulatory power should presume that the governmental unit is acting in good faith and, thus, in the public interest. *In re Spookyworld, Inc.*, 266 B.R. 1 (Bankr. D. Mass. 2001).

The Debtor argues that § 17(d) and (e) of the Agreed Order are perfunctory provisions while subsections (a) through (c) are at the core of Defendants' motivation for revocation of the License. However, the court finds this argument inconsistent with the fact that Debtor paid Defendants prepetition the past due amounts. Accordingly, the court is not persuaded that Defendants' actions were motivated by the desire to collect money. Moreover, the court notes that the Agreed Order was entered into prior to the Petition Date. Therefore, the court cannot hold that Defendants insisted on Debtor's compliance with § 17(d) and (e) in bad faith.[32]

If Defendants believed that Trinity Meadows was not competent to run a racetrack because it did not have the financial wherewithal, it is not for this court to question that decision absent evidence to the contrary. *See In re Spookyworld, Inc.*, 266 B.R. 1 (Bankr. D. Mass. 2001) (holding that the presumption in favor of a governmental unit may be overcome if the party can show that the governmental unit sought to enforce a law that is flagrantly and patently unconstitutional; that the governmental unit is biased; that the governmental unit acted in willful disregard of the law; that the governmental unit clearly abused its discretion in initiating proceedings against the estate representative; or that the proceeding initiated by the governmental unit is or was motivated by a desire to harass, by ill will, or by any other improper motivation).

---

[32] The court also does not believe that the April 1, 1997 deadline was unreasonable. As counsel for Defendants pointed out, the Agreed Order did not provide that Debtor's plan demonstrating its financial viability be *approved* by April 1, but merely that the plan be *submitted* by April 1.

Moreover, the court notes that some courts have permitted governmental units to continue or commence a police or regulatory court action including one for money judgment so long as the action is not an enforcement of the money judgment requiring payment from the estate. *See, e.g., NLRB v. Continental Hagen Corp.*, 932 F.2d 828 (9th Cir. 1991). Because the revocation of the License did not have the effect of transferring money from Debtor to Defendants, the court is comfortable concluding that the police and regulatory power exception applies.

## IV. Conclusion

For the reasons stated above, Defendants' MSJ must be granted and Plaintiff's MSJ denied. The court, however, in doing so does not intend that its ruling should have preclusive effect as to any claims Plaintiff may be able to assert for recovery of funds paid by the Lawleys to the TRC or for misconduct by the TRC and its general counsel.[33]

While such claims may be barred by time or otherwise or not sustainable on facts presented at trial, the court is concerned by the record made at the Hearing. That record reflects that the Lawleys invested substantial moneys in the expectation that they would be able to operate the Willow Park facility. Correspondence from the TRC and its general counsel that is in the record would have encouraged this belief and would have discouraged the Lawleys (and the Trustee) from seeking recovery of the funds paid prepetition pursuant to the Agreed Order until such a recovery was time-barred. Yet during this time frame, the TRC was apparently also considering licensing Lone Star Park. While this coincidence may well be innocent,[34] if it is not,

---

[33] The court, of course, offers no opinion as to whether such claims may be precluded other than by reason of the substance of its rulings on the Motions.

[34] Defendants were not required to rebut a claim of this sort in connection with the Motions. The evidence may well exonerate the TRC and its general counsel as to any claim of, *inter alia*, misconduct or fraudulent inducement.

this court's opinion should not insulate the TRC and its general counsel from investigation or liability should such be appropriate.

Therefore, the court directs that Plaintiff submit a form of judgment granting Defendants' MSJ, the effect of which judgment is strictly limited to the causes of action asserted in this adversary proceeding.

### *###End of Opinion###*